IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| DAVID H. WIMBERLY, | ) |
| Plaintiff, | ) |
| VS. | ) No. 04-1232-T/An |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) |
| Defendant. | ) |

ORDER AFFIRMING COMMISSIONER'S DECISION

Plaintiff David Wimberly filed this action to obtain judicial review of the defendant Commissioner's final decision denying his applications for disability insurance benefits under Title II of the Social Security Act, as amended, 42 U.S.C. § 401 *et seq.*, and for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.* Plaintiff's applications for benefits were denied initially and upon reconsideration by the Social Security Administration. At the plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on October 30, 2003. On March 19, 2004, the ALJ issued a decision finding that plaintiff was not disabled, and the Appeals Council denied plaintiff's request for review. Thus, the ALJ's decision became the final decision of the Commissioner. Plaintiff subsequently filed a complaint in this Court, seeking review of the Commissioner's final decision.

Standard of Review

Judicial review in this court is limited to determining whether or not there is substantial evidence in the record as a whole to support the Commissioner's decision, and whether the correct legal standards were applied. See 42 U.S.C. § 405 (g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Her v. Commissioner of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999); Walters v. Commissioner of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Drummond v. Commissioner of Soc. Sec., 126 F.3d 837, 840 (6th Cir. 1997); Cutlip v. Secretary of Health and Human Serv., 25 F.3d 284, 286 (6th Cir. 1994). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion. Perales, 402 U.S. at 401; Her, 203 F.3d at 389; Drummond, 126 F.3d at 840; Cutlip, 25 F.3d at 286. The reviewing court may not resolve conflicts in the evidence nor decide questions of credibility. Walters, 127 F.3d at 528 (quoting Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984)); Cutlip, 25 F.3d at 286. In addition, if the decision is supported by substantial evidence, it should not be reversed even if substantial evidence also supports the opposite conclusion. Smith v. Chater, 99 F.3d 780, 782 (6th Cir. 1996) (citing Cutlip, 25 F.3d at 286).

Background of the Case

On the date of the administrative hearing, plaintiff was forty-eight years of age. He has a college education, with past relevant work experience as a welder, machine operator and highrider (operating a machine to pull orders). In his initial disability report, plaintiff

2

alleged that he became disabled on October 15, 2000, due to seizures. (R. 101.) In his reconsideration report, plaintiff reported that he had sextuple coronary artery bypass surgery in April 2002; he also alleged extreme pain in his hips, spine and pelvis. (R. 145.)

In his decision, the ALJ found that plaintiff's seizures and back pain were severe impairments, but did not meet or equal the listed impairments in Appendix 1, Subpart P, Regulation No. 4. He found that plaintiff's subjective complaints were not consistent with the medical evidence and so were not fully credible. The ALJ further found that plaintiff had the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday; therefore, he had the ability to perform light work. However, plaintiff should never climb ladders, ropes, or scaffolds, should avoid concentrated exposure to extreme cold and heat, and should avoid hazards such as machinery and heights. Accordingly, plaintiff was unable to perform his past relevant work. Given plaintiff's residual functional capacity and other vocational factors, vocational Rule 202.21, 20 C.F.R. pt. 404, subpt, P, App. 2, directed a finding of "not disabled," so that plaintiff was not under a "disability" as defined in the Social Security Act. (R. 16-24.)

## Analysis

The Social Security Act defines disability as the inability to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1). The initial burden of going forward is on the claimant to show that he is disabled from engaging in his former employment; the burden

3

then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. 42 U.S.C. § 423; see Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994). The claimant bears the ultimate burden of establishing an entitlement to benefits. Cotton v. Sullivan, 2 F.3d 692, 695 (6th Cir. 1993).

In determining disability, the Commissioner conducts a five-step sequential analysis, as set forth in 20 C.F.R. § 404.1520 and § 416.920:

1. An individual who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
2. An individual who does not have a severe impairment will not be found to be disabled.
3. A finding of disability will be made without consideration of vocational factors if an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment found in 20 C.F.R. Part 404, Subpart. P, Appendix 1.
4. An individual who can perform work that she has done in the past will not be found to be disabled.
5. If an individual cannot perform her past relevant work, other factors including age, education, past work experience, and residual functional capacity will be considered to determine if other work can be performed.

Further analysis is unnecessary if it is determined that an individual is not disabled at any point in this sequential evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); Hogg v. Sullivan, 987 F.2d 328, 331 (6th Cir. 1989). Here, the analysis proceeded to the fifth step, where the ALJ used the medical-vocational guidelines to determine that, based on plaintiff's age, education, past work experience and residual functional capacity, there was other work that he could perform. Plaintiff, however, contends that the ALJ's determination that he has

4

the residual functional capacity to perform light work is not supported by substantial evidence.

According to the medical evidence in the record, in August 1999, plaintiff had what was then diagnosed as a transient ischemic attack ("TIA") or mini-stroke. Magnetic resonance imaging (MRI) showed mild bilateral cerebral atrophy. (R. 393.) In October or November 2000 plaintiff had two episodes of suspected seizure activity, but did not go to the hospital. (R. 44-45.) In February 2001, plaintiff lost consciousness at work and was found on the floor near his fork lift. He was taken to the emergency room in Dyersburg, Tennessee, where he had a computer tomography scan (CT scan). (R. 167-176.) Upon referral by Dr. Jerald White, M.D., who had been plaintiff's treating physician since 1998, plaintiff was transferred to the Jackson Madison County General Hospital in Jackson, Tennessee, to be evaluated by Dr. Karl Misulis, M.D. Dr. Misulis reviewed the CT scan, which was unremarkable, as was an echocardiogram. Electroencephalogram (EEG), MRI, and Holter monitor were normal. Plaintiff's neurological examination was normal except for 1+ ankle jerks. Dr. Misulis prescribed Dilantin for the plaintiff and gave him detailed instructions regarding seizure precautions before he was discharged. (R. 281-285.)

Following his hospitalization, plaintiff continued to be treated by Dr. Misulis for seizures. They discussed whether plaintiff could go back to work, and Dr. Misulis advised him that, for a period of three months after the last seizure episode, he should not drive or operate machinery that might put himself or others in danger. On both February 28, 2001

5

and April 27, 2001 plaintiff reported no further episodes of seizure activity to Dr. Misulis. Noting that he was "thrilled" with plaintiff's progress, Dr. Misulis released plaintiff to go back to work without restrictions on May 20, 2001. In July 2001, plaintiff still reported no further seizure activity, and Dr. Misulis stated that he was "pretty much unrestricted." (R. 204-208.)

On February 1, 2002, plaintiff reported to Dr. Misulis that he was doing "pretty well" and was looking for a job, but that he had had two seizures, one on November 17, 2001 and another a few days before on January 28, 2002. Seizure precautions were again discussed, including the need to avoid driving, operating dangerous machinery, working at unprotected heights or other activities where he could injure himself if he had a seizure. (R. 203.)

On April 14, 2002 plaintiff suffered a heart attack. He underwent heart catheterization on April 15, 2002 and sextuple coronary artery bypass surgery on April 19, 2002. (R. 255, 257.) On May 6, 2002 his surgeon, Dr. John T. Matthews, M.D., was pleased with plaintiff's progress. He noted that plaintiff's wounds were well healed and his cardiac examination was normal. Dr. Matthews also stated, "[s]ince leaving the hospital, Mr. Wimberly has done very well. He has been quite active." (R. 198.)

Plaintiff saw Dr. Misulis again on May 31, 2002, reporting no further episodes of seizure. He told Dr. Misulis that he had applied for, and intended to take, a non-paying position as chaplain for the Crockett County Sheriff's Department. Dr. Misulis noted, "[h]e looks the best I have seen him" and "I am thrilled with how well he has done. His exam

looks so good I don't think we need to do any other diagnostic studies now." (R. 202.)

Plaintiff was treated at the Medical Specialty Clinic for follow-up after bypass surgery. On August 29, 2002, Dr. Thomas Salvucci, D.O., noted that plaintiff was "doing very well from a cardiac perspective. He can certainly perform normal activities at this time." (R. 308.)

Also on August 29, 2002, plaintiff reported to Dr. Misulis that he was doing well, still with no further seizure activity. Dr. Misulis noted that plaintiff was applying for disability, and indicated, "I certainly support him, I do believe he is disabled for the jobs he was doing beforehand." He again noted, "I am thrilled with his progress." Dr. Misulis prepared a letter dated that same day, "To Whom It May Concern," stating that plaintiff was permanently and totally disabled. (R. 200-201.)

On October 11, 2002, plaintiff was seen by Dr. Kelly Pucek, M.D., for complaints of back pain and stiffness. Examination showed diffuse tenderness over his lower lumbar spine and sacroiliac (SI) joint region. X-rays showed fusion of his SI joints bilaterally and some degenerative changes in his lumbar spine, but nothing severe. Dr. Pucek's impression was that plaintiff had ankylosing spondylitis, and stated that plaintiff would be referred to a rheumatologist. Plaintiff was given a prescription for pain medication. (R. 219, 354-355.)

Plaintiff was seen by a rheumatologist, Dr. Jacob Aelion, M.D., on October 22, 2002, for complaints of right buttock pain. X-rays showed what appeared to be fusion of the lower 2/3rds of the SI joints, well maintained hip joints, and severe osteopenia with no evidence

7

of fractures. (R. 345, 347-349.) An MRI done on October 25, 2002 showed a central disc herniation at L4 with a moderate degree of central spinal stenosis and fusion of the lower 2/3rds of the SI joints. However, Dr. Aelion found no active sacroiliac disease. (R. 244, 350-352.) Plaintiff was still complaining of low pain and right buttock pain on May 16, 2003. Dr. Aelion noted that plaintiff was taking Bextra, and suggested that he continue symptomatic relief. He also stated that plaintiff would be referred for an aquatic physical therapy program. (R. 343-344.)

On November 4, 2002, plaintiff underwent a consultative examination by Dr. Donita Keown, M.D. He reported that his last grand mal seizure was in January 2002, but that he had petit mal seizures daily with staring spells that lasted several minutes. Plaintiff reported occasionally having a "sharp, tingling type sensation" in his left chest, which passed quickly. Since his bypass surgery in April, he used nitroglycerin tablets on two occasions when he had pain that felt like indigestion. An EKG showed normal sinus rhythm with T wave abnormalities in high lateral leads, left axis deviation and a heart rate of 61. He showed no evidence of impaired station or gait. Based on her examination, Dr. Keown assessed that plaintiff could sit for six hours in an eight-hour workday and walk or stand for six hours in an eight-hour workday, with routine lifting of ten to fifteen pounds and episodic lifting of twenty to twenty-five pounds. (R. 221-223.)

On November 18, 2002, plaintiff went to the emergency room when he experienced chest pain after overexerting himself the previous week. Given plaintiff's cardiac history,

8

Dr. Salvucci recommended a repeat heart catheterization, which was done on November 21, 2002. (R. 334-336.) The procedure showed that plaintiff appeared to be well vascularized. Dr. Salvucci noted that plaintiff's pain was atypical, his cardiac enzymes were negative, and his EKG showed only normal sinus rhythm with nonspecific abnormalities. Plaintiff was discharged with instructions to avoid heavy lifting and driving for two days, after which he could gradually increase his activities. (R. 324-326.)

On December 23, 2002, plaintiff reported to Dr. Salvucci that he had experienced no real chest discomfort since he was last seen. Dr. Salvucci noted that plaintiff seemed "to be well from a cardiac perspective." (R. 322-323.) On July 1, 2003, Dr. Salvucci noted that plaintiff "has been doing excellent. He has remained active. He gets no chest pain or shortness of breath." (R. 321.)

On April 14, 2003, Dr. Misulis noted that plaintiff was doing well, with no seizures, but that he reported some recent dizziness. Due to plaintiff's history and the recent dizziness, Dr. Misulis ordered an MRI of plaintiff's brain. (R. 367.) The MRI showed mild diffuse cerebral atrophy, but was otherwise normal. This was basically unchanged from the MRI that was done in 1999. (R. 366, 380.)

On October 14, 2003, Dr. Jerald White prepared a letter, "To Whom It May Concern," in which he briefly recited plaintiff's medical history, including heart problems, seizures and degenerative disc disease. He stated, "I support him in his application for disability." (R. 356.)

On November 4, 2003, upon referral by Dr. White for a neurological consult, plaintiff was examined by Kaye Chipman, FNP. Plaintiff reported that he had five to six seizures per month, with the most recent only two days prior. Her physical examination of plaintiff was normal in all respects except for a loss of pinprick perception distally in both lower extremities. Her assessment was complex partial seizures. She advised plaintiff to continue his Dilantin, and added a prescription for Tegretol. (R. 428-431.)

At the administrative hearing on October 30, 2003, plaintiff testified that he took his Dilantin as directed. However, his last seizure was the day before, and he had another the previous week. He testified that he had seizures three times a week. (R. 48-49.) Plaintiff testified that since his bypass surgery his heart felt good and strong, and that he was having no particular heart problems. (R. 51-52.) He further testified that the pain in his back and hip was excruciating if he did not take his medication. (R. 52-53.) When asked what he did all day long, plaintiff testified that he sat and looked out the window, watched television, read, or played with his cat. (R. 57-58.) He testified that he could take care of his own personal needs, and that he could wash dishes and cook. (R. 58.) He testified that if he "pushed it" he could stand for thirty minutes in an eight-hour workday and that he was uncomfortable sitting if the chair unless it was soft or he was sitting on a pillow. (R. 59.)

The plaintiff first argues that the ALJ did not give proper weight to the opinions of

his treating physicians.[1] While a treating physician's opinion is normally entitled to substantial deference, the ALJ is not bound by that opinion. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 477 (6th Cir. 2003). The ALJ may reject the opinion of the treating physician if it is not supported by sufficient medical data, Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004), or if there is substantial evidence to the contrary. Walters v. Commissioner of Social Sec., 127 F.3d 525, 529-30 (6th Cir. 1997).

In a letter dated August 29, 2002, Dr. Misulis stated that he believed plaintiff was "permanently and totally disabled." (R. 200.) The ALJ noted that this opinion was inconsistent with Dr. Misulis's own progress notes from that same date in which he stated that he was "thrilled" with plaintiff's progress because he had had "no further episodes" of seizure activity since January 28, 2002. (R. 201-203.) In fact, although Dr. Misulis noted in his progress notes that he supported plaintiff in his claim for disability, he actually stated only that plaintiff was "disabled for the jobs he was doing beforehand." (R. 201.) The ALJ's decision is consistent with this opinion, as he found that plaintiff was unable to return

---

[1] On May 3, 2004, after the ALJ's decision denying plaintiff's claim, both Dr. White and Dr. Misulis prepared letters "To Whom It May Concern." Dr. White stated, "[i]t has been several months since he had a grand mal seizure, although he still has complex partial seizures and is under the care of a neurologist." (R. 432.) Dr. Misulis stated that he was treating plaintiff for seizures, memory difficulty, and vascular disease. He further stated that while plaintiff was on Dilantin, which "can help these symptoms it does not cure the problem. Therefore, this is a chronic neurologic problem that will need continuing care. In my opinion, he is disabled." (R. 433.)

These letters from Dr. White and Dr. Misulis were submitted only to the Appeals Council, which denied plaintiff's request for review. Therefore, they may not be considered by this Court "in deciding whether to uphold, modify, or reverse the ALJ's decision. See Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996). A district court may consider such evidence only for the limited purpose of deciding whether it merits a sentence six remand, if the claimant shows that the evidence is new and material, and that there was good cause for not presenting it before the ALJ. Id. Plaintiff requested no sentence six remand in this case and has made no such showing.

11

to his past relevant work.

On February 1, 2002, after plaintiff reported having had the seizure on January 28, 2002 and another on November 17, 2001, Dr. Misulis restricted him from "driving, operating dangerous machinery, working at unprotected heights, or engaging in other activities where he could injure himself if he were to have a seizure." (R. 203.) He specified no other functional limitations. The ALJ included the restrictions imposed by Dr. Misulis in his decision regarding plaintiff's residual functional capacity.

Although Dr. White indicated in a letter dated October 14, 2003 that he supported plaintiff in his disability claim, he never provided any specific assessment of plaintiff's functional limitations. Essentially, the letter is merely a listing of the various impairments for which plaintiff has been treated, without any explanation of how those impairments actually affect his physical abilities. (R. 356.) For example, Dr. White referred to plaintiff's coronary bypass surgery, but plaintiff would testify at the administrative hearing little more than two weeks later that he no longer had any particular heart problems. (R. 51-52.)

The ALJ properly rejected the conclusory opinion of Dr. Misulis that plaintiff was permanently and totally disabled, as well as Dr. White's "support" of plaintiff's disability claim. These opinions simply are not supported by the physicians' own treatment and progress notes.

Plaintiff also contends that the ALJ erroneously found that his subjective complaints were not fully credible. A claimant's testimony, taken alone, will not establish that he is

12

disabled; instead, there must be objective medical findings which show the existence of a medical impairment that could reasonably be expected to give rise to the subjective complaints alleged:

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment . . . which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished . . . (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques . . . must be considered in reaching a conclusion as to whether the individual is under a disability.

42 U.S.C. § 423(d)(5)(A), § 1382c(a)(3)(H)(i). See also, 20 C.F.R. § 404.1529(a), § 416.1529(a); Felisky v. Bowen, 35 F.3d 1027, 1039 n.2 (6th Cir. 1994); Duncan v. Secretary of Health and Human Serv., 801 F.2d 847, 852-54 (6th Cir. 1986). When a claimant alleges fully disabling pain or other symptoms, the "ALJ may distrust [the] claimant's allegations . . . if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other." Moon v. Sullivan, 923 F.2d 1175, 1182-83 (6th Cir. 1990); see also Walters, 127 F.3d at 531 (Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.").

13

The ALJ in this case explained that plaintiff's statements regarding the frequency of his seizures were inconsistent. On November 4, 2002, plaintiff told Dr. Keown that he had petit mal seizures daily, (R. 221), yet little more than two months prior, on August 29, 2002, Dr. Misulis noted that plaintiff had reported no seizures since his last grand mal seizure on January 28, 2002. On April 14, 2003, Dr. Misulis noted that plaintiff still had no seizure activity. (R. 367.) Approximately six months later, on October 23, 2003, Dr. White's treatment notes show that plaintiff reported "a few light seizures but none are severe." (R. 398.) A week later, at the hearing on October 30, 2003, plaintiff testified that he was having seizures three times a week. (R. 48-49.) Four days after that, on November 4, 2003, plaintiff told FNP Chipman that he had seizures five or six times a month. (R. 428.)

The ALJ also noted that plaintiff told Dr. Misulis in February 2002 that he was looking for a job, and that Dr. Misulis indicated in May 2002 that plaintiff was going to take a non-paying position with the Crockett County Sheriff's Department.[2] (R. 202-203.) The fact that plaintiff was actively looking for work is not consistent with his claim of disability.

Although the ALJ did not discuss in detail plaintiff's complaints of pain in his back and right hip, the objective medical evidence does not support plaintiff's allegations that he experiences disabling pain. While Dr. Aelion diagnosed a herniated disc and partial fusion of the SI joints, he found no active sacroiliac disease. (R. 350-352.) Plaintiff himself

---

[2] Whether plaintiff actually took this position is not clear from the record. When plaintiff was hospitalized in November 2002 for a repeat heart catheterization, Dr. Salvucci noted, "Occupational history. He is in a ministry." (R. 233.)

14

testified that the pain was excruciating only if he did not take his pain medication. (R. 52-53.) Although he also testified that Dr. Aelion told him that he was not allowed to walk, (R. 54), that is not reflected in Dr. Aelion's treatment notes. Dr. Aelion noted that plaintiff should continue symptomatic relief, and that he would be referred for aquatic physical therapy. (R. 344.) Nowhere in his notes does he indicate that plaintiff is "not supposed to walk." (R. 343-352.)

The ALJ properly evaluated plaintiff's subjective complaints of pain and other symptoms. Therefore, his credibility determination should not be disturbed.

While Dr. Misulis and Dr. White both indicated their support of plaintiff's disability claim, neither provided any specific assessments of plaintiff's functional capacity, and their conclusory opinions are inconsistent with their own medical findings. Likewise, Dr. Aelion and Dr. Pucek also provided no functional assessments. Dr. Keown found that plaintiff could perform light work, *i.e.*, sit for six hours in an eight-hour workday, walk or stand for six hours in an eight-hour workday, routinely lift ten to fifteen pounds and occasionally lift twenty to twenty-five pounds. (R. 221-223.) The additional seizure precautions added by Dr. Misulis do not significantly limit plaintiff's ability to do a full range of light work. Therefore, the ALJ's determination of plaintiff's residual functional capacity is supported by substantial evidence, and the medical-vocational guidelines direct a finding of "not disabled." 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 202.21.

For the foregoing reasons, the Court concludes that the ALJ's determination that plaintiff is not disabled is supported by substantial evidence and is not contrary to law. The Commissioner's decision is AFFIRMED. The Clerk of Court is directed to prepare a judgment.

IT IS SO ORDERED.

_/s/ James D. Todd_
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

23 September 2005
DATE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 10 in case 1:04-CV-01232 was distributed by fax, mail, or direct printing on September 23, 2005 to the parties listed.

---

Joe A. Dycus
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

L. Lee Harrell
HARRELL & HARRELL
110 Northwest Court Sq.
Trenton, TN 38382

Honorable James Todd
US DISTRICT COURT